**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Berthel Fisher & Company Financial Services, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Gary S. Frandino, <br><br> Defendant. | No. CV-12-02165-PHX-NVW <br><br> **ORDER** |

Before the Court are Plaintiff's Motion for Preliminary Injunction (Doc. 6), the Response, and the Reply. Plaintiff's Motion will be granted.

**I.  FACTUAL BACKGROUND**

The relevant alleged facts of this action are straightforward and generally undisputed. Defendant Gary Frandino ("Defendant") had been investing in blue chip stocks for decades when he moved to Arizona and decided to move funds away from his prior investment firm. In late 2007, he met George Kardaras; Kardaras was a registered representative of independent broker-dealer J.P. Turner & Company. (Doc. 20 at 2.) Starting in February 2008, Defendant acted on Kardaras' investment advice and began investing in Echo Canyon, LLC ("Echo Canyon"), a company purportedly involved in wholesale vehicle exporting and resale. The sole member of Echo Canyon was Mr. Brian Borakowski ("Borakowski"), who had been Kardaras' colleague from April 2003 through June 2006. By the time Defendant began investing with Borakowski, Borakowski had become a registered representative of American Capital Partners, LLC.

Defendant's investment in Echo Canyon involved the loan of money by Defendant in exchange for promissory notes from Echo Canyon. (Doc. 9-1 at 36-37.) The promissory notes committed Echo Canyon to providing Defendant with interest payments and to repaying the principal of the loan at the close of the note term. (*Id.*) The promissory notes bore Defendant's signature, as well as that of Borakowski acting for Echo Canyon. Further, communications between Defendant and Borakowski were sent to or from Borakowski's personal email address, not one associated with any broker-dealer. (Doc. 9-1 at 39-40.) Defendant does not mention any communication with Borakowski before the promissory notes were signed. Defendant asserts that, by November 2009, he had invested approximately $211,500 in Echo Canyon. (Doc. 20 at 3.)

On March 28, 2012, Defendant commenced an arbitration action with the Financial Industry Regulatory Authority ("FINRA"), an independent regulator for securities firms conducting business in the United States, against Kardaras, Borakowski, J.P. Turner & Company, and others. (*See* Doc. 9-1 at 2-34.) He sought to recover for losses allegedly exceeding $525,000 associated with investments made pursuant to Kardaras' advice (*id.* at 32), as Defendant claimed Kardaras had recommended or placed money in "numerous unsuitable, illiquid and risky investments." (*Id.* at 7.) Defendant alleged in particular that Echo Canyon "may [have been] an entirely fraudulent investment" (*id.*), and that his investment in Echo Canyon, made "again on the advice of Respondent George Kardaras, as a registered representative of Respondent J. P. Turner" was "at the very least highly unsuitable . . . as it came with a high level of risk . . . ." (*Id.* at 10.) Defendant's claims in the Statement of Claim range from negligence and breach of fiduciary duty to violations of state and federal securities law. (*Id.* at 14-30.)

Among the parties from which Defendant sought relief through arbitration is Plaintiff Berthel Fisher & Company Financial Services, Inc. ("Plaintiff" or "Berthel Fisher"). Plaintiff is an independent broker-dealer incorporated in Iowa and is a licensed member of FINRA. (Doc. 7 at 2.) As a member of FINRA, Plaintiff is required to

arbitrate disputes that fall within the guidelines provided by FINRA's Code of Arbitration Procedure governing arbitrations between investors and brokers and/or brokerage firms. Borakowski became a registered representative of Plaintiff starting in August 2009 (*see* Doc. 20-1 at 7), after Defendant had begun investing in Echo Canyon. As Defendant continued to invest money with Borakowski for Echo Canyon after Borakowski became associated with Plaintiff, Defendant sought to make Plaintiff subject to arbitration. (Doc. 20 at 3-4.) Plaintiff, however, never approved, recommended, or sold investments in or loans to Echo Canyon, and Defendant never had an account with, made an investment through, or sought investment advice from Plaintiff. (Doc. 7 at 3-4.) Further, Defendant does not allege and offers no evidence that he was aware of or relied on any perceived affiliation between Borakowski and Plaintiff. (*Cf.* Doc. 10-1 at 10.) Plaintiff seeks a preliminary injunction against arbitration on the grounds that Defendant does not have a relationship with Plaintiff or any person associated with Plaintiff that would require Plaintiff to participate in the arbitration of Defendant's claims. (*See* Doc. 7 at 1.)[1]

## II. LEGAL STANDARD AND ANALYSIS

### A. Preliminary Injunction

In order to obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of the preliminary injunction; (3) that the injunction serves the public interest; and (4) that the balance of equities favors the plaintiff. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first prong of the test—the likelihood of success on the merits—is established when the plaintiff demonstrates that "serious questions going to the merits" of the dispute exist. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

### B. Arbitrability

Arbitrability is the "question [of] whether the parties have submitted a particular

---

[1] Plaintiff filed a Motion to Dismiss before a FINRA arbitration panel on the same grounds on which it seeks a preliminary injunction. The arbitration panel denied that motion without explanation. (*See* Doc. 32-1).

dispute to arbitration," *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002), and the issue of arbitrability is for the court to decide unless the parties "clearly and unmistakably provide otherwise." *Id.* (quoting *AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)); *see also John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 57 (2d Cir. 2001) (holding one party's membership in a regulatory exchange insufficient to establish parties' clear and unmistakable intent to have arbitrator decide issue of arbitrability). The basic principle at play in the determination of arbitrability is that an arbitrator has authority because the parties agreed in advance to resolve such disputes through arbitration. *AT & T*, 475 U.S. at 648-49. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 648 (internal quotation marks and citations omitted).

When determining whether to compel arbitration, the first inquiry is whether the parties have agreed to arbitrate the underlying dispute. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). A written arbitration agreement between the parties is generally valid and enforceable. *See Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 474 (1989) (discussing Federal Arbitration Act, 9 U.S.C. § 2). Absent a written agreement, the dispute between Plaintiff and Defendant is still arbitrable if as a member of FINRA, Plaintiff is obligated by the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Customer Code" or "Code") to arbitrate its dispute with Defendant. *See Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 763 (N.D. Cal. 2008) (noting that under the Code, "customers can compel registered members of FINRA to arbitrate certain disputes even when no written arbitration agreement exists").[2] Rule 12200 of the FINRA Customer Code provides as follows:

> Parties must arbitrate a dispute under the Code if:
> - Arbitration under the Code is either:
>     (1) Required by a written agreement, or

---

[2] *Herbert J. Sims & Company, Inc. v. Roven*, 548 F. Supp. 2d 759 (N.D. Cal. 2008), discusses the arbitration code under the National Association of Securities Dealers ("NASD"), the predecessor to FINRA's arbitration code.

- 4 -

>      (2) Requested by the customer;
> - The dispute is between a customer and a member or associated person of a member; and
> - The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Rule 12200 - Arbitration Under an Arbitration Agreement or the Rules of FINRA, Code of Arbitration Procedure for Customer Disputes.[3] Rule 12100 in turn defines "customer" by clarifying that "[a] customer shall not include a broker or dealer," and an "associated person" as "a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member . . . ." Rule 12100 - Definitions, Code of Arbitration Procedure for Customer Disputes. If the dispute between Plaintiff and Defendant falls within the purview of the FINRA Customer Code Rule 12200, then it is subject to arbitration. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *John Hancock*, 254 F.3d at 58 (internal quotation marks and citations omitted).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

##### 1. Legal question

The parties have not clearly and unmistakably committed to having the issue of arbitrability decided by an arbitrator, and therefore it is an issue for the court to decide. At least for the purposes of the pending motion, the parties do not dispute that: (1) Plaintiff Berthel Fisher is a member of FINRA; (2) no written arbitration agreement (apart from the FINRA Customer Code at issue) exists between Plaintiff and Defendant; (3) Brian Borakowski became a registered representative of Plaintiff and thus an associated person of Plaintiff; (4) some transaction involving the exchange of funds for promissory notes happened between Echo Canyon and Defendant; (5) Defendant has

---

[3] The FINRA Code of Arbitration Procedure for Customer Disputes is available at http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4096.

- 5 -

requested an arbitration under the FINRA Customer Code; and (6) Plaintiff has not previously agreed to and presently objects to any arbitration. It is further undisputed that Defendant never sought investment advice from Plaintiff, never opened an account with Plaintiff, and never received investment or brokerage services from Plaintiff. (*See* Doc. 7 at 3-4.) Accordingly, Plaintiff asserts that there is no "direct customer" relationship—a customer relationship that does not involve an associated person—between it and Defendant, and Defendant does not argue otherwise. (*See* Doc. 20 at 5-10.)

As Defendant is not a "direct customer" of Plaintiff, the parties agree that the only remaining question is whether Defendant qualifies as a customer of Brian Borakowski, Plaintiff's associated member, and therefore as a customer of Plaintiff. Defendant contends that it is such a customer under the Code; Plaintiff disagrees. If Defendant is a customer of Borakowski and thereby of Plaintiff under the FINRA Customer Code, then Plaintiff cannot establish serious questions as to the issue of arbitrability.

### 2. **Customers of associated persons**

Case law as to the definition of "customer" for FINRA purposes is unsettled; courts have embraced a range of approaches to clarifying the meaning of the term, and consequently a variety of definitions. The lack of clarity stems in part from the ambiguity inherent in the FINRA Customer Code. In its section on definitions, the FINRA Customer Code's says only that a "customer" is not a broker or a dealer. Rule 12100 - Definitions, Code of Arbitration Procedure for Customer Disputes. The Ninth Circuit has not spoken on the matter, but other courts have consistently recognized that "customer" cannot embrace the universe of non-brokers and non-dealers and have therefore rejected the expansive contention that anyone who is not a broker or dealer qualifies as a FINRA customer. *See, e.g.*, *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770, 772 (8th Cir. 2001); *Morgan Keegan & Co., Inc. v. Jindra*, No. C11-5704BHS, 2011 WL 5869586, at *3 (W.D. Wash. Nov. 22, 2011) ("In the past, courts generally have construed the term 'customer' broadly, but not so broadly as to include everyone who is not considered a broker or a dealer."). Instead, in keeping with

the sense that "customer" has a broad but not unconstrained sweep, it is frequently defined in a manner that does not upset the reasonable expectations of FINRA members. *See, e.g.*, *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993) (rejecting rule regarding customer status that "would do significant injustice to the reasonable expectations" of FINRA members).

Also contributing to the uncertainty in the definition of "customer" is the conflict between principles underpinning investment activity in the world of FINRA. On the one hand is FINRA's stated mission: "to protect investors by maintaining the fairness of the U.S. capital markets." FINRA, http://www.finra.org (last visited May 1, 2013). Coupled with this is investors' broad sense that they have access to FINRA arbitration should investment-related disputes arise. On the other hand is the common-sense principle that there must be some limits to FINRA's reach: broker-dealers have agreed to certain conditions, including arbitration in particular circumstances, in exchange for FINRA membership, but they cannot be compelled to do more than they agreed to do. Further, an overly-expansive approach to FINRA arbitration would extend to every business deal or transaction entered into by the members' associated persons. Such a system would not reconcile with the "reasonable expectations" of FINRA members. Accordingly, the state of case law on the meaning of "customer" reflects the tug-of-war between competing understandings of how broad-reaching FINRA's authority is.

That said, some things are clear. First, even without a direct connection to Plaintiff, Defendant may still be Plaintiff's customer. A customer of an associated person of the member is a customer of the member. *See, e.g.*, *MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340, 1344 (11th Cir. 2004); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001); *Waveland Capital Partners, LLC v. Tommerup*, 840 F. Supp. 2d 1243, 1250 (D. Mont. 2012) (noting that the addition of words "of a member" after "customer" was explicitly rejected because it would "narrow the scope of claims that are required to be arbitrated under the Customer Code") (quoting *Order Approving Proposed Rule Change to Amend NASD Arbitration Rules for Customer Disputes*, 72 Fed. Reg.

4574, 4579 (2007)). Plaintiff does not dispute the allegation that Brian Borakowski was its registered representative and therefore a person associated with Plaintiff. Accordingly, if Defendant was a customer of Borakowski, then Defendant was a customer of Plaintiff.

In addition, although assessing customer status is a fact-specific inquiry, two considerations are fairly consistently relevant. The first is the nature of the dealings or services between the associated person and the investor. The second consideration, again relevant though not necessarily dispositive, is whether the associated person represented that he was acting on behalf of a FINRA member, or the investor perceived as much. An investor is most likely a customer of the associated person if the latter acts as a broker, providing advice regarding investments and facilitating the sale of securities to the investor, and if the associated person acted as a representative of the FINRA member.

### 3. Defendant does not qualify as Borakowski's customer

#### a. Nature of dealings

In assessing the nature of the dealings between the parties, the Eighth Circuit has concluded that the definition of customer "does not include an entity . . . [that] only received financial advice, without receiving investment or brokerage related services . . . ." *Fleet Boston*, 264 F.3d at 773. If an associated person of a FINRA member "induces, or shepherds, the investment, then the investor is . . . likely a customer of that firm." *Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 764 (N. D. Cal. 2008) (citing *Oppenheimer & Company, Inc. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995)). Investors are not customers when they "[can]not show that the FINRA member [or associated person] provided any financial services related to the buying or selling of securities directly to those investors." *Ross Sinclaire & Assocs. v. Premier Sr. Living, LLC*, No. 11-CV-5104 YGR, 2012 WL 2501115, at *7 (N.D. Cal. June 27, 2012); *cf. Citigroup Global Mkts. v. Abbar*, No. 11 Civ 6993(LLS), 2013 WL 1855733, at *4 (noting that it is "increasingly adopted by the courts and by FINRA" that "the investor is the customer of the party with which he has the account and consummates the

transaction").

That the associated person acts as a broker—provides investment or brokerage services—for the investor means that the investor is a customer. In *Oppenheimer*, the Vice President of broker-dealer Oppenheimer & Co., Inc. ("Oppenheimer") solicited investments through Oppenheimer; in response an investor and his trustee arranged for the Vice President to place over $3 million with Oppenheimer for investment. 56 F.3d at 354. When the Vice President lost or stole the invested funds, the investor and the trustee sought to arbitrate their claim with Oppenheimer. The Second Circuit affirmed the holding that the investor and trustee were customers because: (1) the Vice President had solicited investments and acted as a broker on Oppenheimer's behalf; and (2) the investor had given funds to the Vice President, a representative of Oppenheimer, with the intention of establishing an account with Oppenheimer. *Id.* at 357. Similarly, in *Waveland Capital Partners, LLC v. Tommerup*, the investors relied on the advice and recommendations of Waveland Capital Partners' registered agent when making their investment decisions, making the investors customers of the registered agent and thereby of Waveland Capital Partners. 840 F. Supp. 2d 1243, 1250 (D. Mont. 2012). *See also, e.g.*, *O.N. Equity Sales Co. v. Stephens*, No. 4:07cv269-RH/WCS, 2008 WL 835808, at *1, *5 (N.D. Fla. Mar. 28, 2008) (investor was customer of registered representative because representative participated in sale of shares of third-party business trust to the investor and helped her execute new documents confirming her subscription participation).

The common thread in these cases and others is that the associated person of the FINRA member served as a broker or investment advisor for the investor. While even informal business relationships between investors and registered representatives of FINRA members can give rise to customer status, the registered representatives in those cases still functioned as brokers in advisory roles. *See Vestax Sec. Corp. v. McWood*, 116 F. Supp. 2d 865, 866 (E.D. Mich. 2000); *WMA Sec., Inc. v. Ruppert*, 80 F. Supp. 2d 786, 788-89 (S.D. Ohio 1999). Further, evidence that the investor purchased a good or service

1  from the associated person can be dispositive of customer status. *See Citigroup*, 2013
2  WL 1855733, at *5 (finding that "courts have taken a purchase transaction as the defining
3  proof" of customer status); *see also, e.g.*, *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps.,*
4  *Inc.*, 660 F.3d 643, 650 (2d Cir. 2011) (holding that "'customer' includes at least a non-
5  broker or non-dealer who purchases, or undertakes to purchase, a good or service from a
6  FINRA member").

7  When the associated person does not act as a broker, it is less likely that an
8  investor is a customer. In *Herbert J. Sims*, investors who had accounts with brokerage
9  Muriel Seibert & Co., Inc. communicated with investment advisor James Darden III
10 ("Darden"). 548 F. Supp. 2d at 760. Darden conferred with broker Scott Drayer
11 ("Drayer"), a registered representative of broker-dealer and FINRA member Herbert J.
12 Sims & Co, Inc. as to the broker-dealer's bond offerings. *Id.* at 761. Darden's investors
13 participated in approximately forty bond offerings by Herbert J. Sims & Co., Inc. over the
14 years, including—based on Drayer's representations—one offering that was allegedly an
15 unsuitable investment for the investors. *Id.* The relevant facts included that: (1) the
16 investors did not invest directly through Herbert J. Sims & Co., Inc. or through a
17 representative thereof; (2) the investors had accounts with Muriel Seibert & Co., Inc. and
18 were clients of Darden; (3) Darden was not an agent or representative of Herbert J. Sims
19 & Co., Inc.; and (4) no evidence existed of communications between the investors and
20 Drayer or Herbert J. Sims & Co., Inc. *Id.* at 764-65. The court then concluded that the
21 relationship between the investors and Herbert J. Sims & Co., Inc. was likely too tenuous
22 to qualify as a customer relationship that could be the basis of compelled arbitration, *id.*
23 at 766, as the investors were not customers of Drayer.

24 Here, as in *Herbert J. Sims*, the investor (Defendant) did not invest directly
25 through Plaintiff or Borakowski (as distinguished from investing in Borakowski's LLC).
26 Defendant's interactions with Borakowski amounted to investing in Echo Canyon, LLC,
27 of which Borakowski was the sole member. Kardaras, a broker unaffiliated with
28 Plaintiff, advised Defendant to invest his money in—meaning lend his money to—the

1  LLC, which was to repay the loan with interest. Kardaras, not Borakowski, provided
2  Defendant with the investment and brokerage services that led to the transaction in
3  question; as Defendant notes, he was Kardaras' customer (Doc. 10 ¶ 2). Borakowski's
4  LLC was a third-party beneficiary of Defendant's customer relationship with Kardaras,
5  and Borakowski simply received the funds on behalf of Echo Canyon. Receiving funds
6  invested in an LLC does not constitute the type of "investment or brokerage services"
7  contemplated by FINRA, Borakowski did not act as a broker for Defendant, and
8  Defendant purchased neither any good nor any service from Borakowski. Thus, the first
9  consideration suggests that Defendant is not Borakowski's customer.

### b. Representation of FINRA member

The second important consideration in assessing the presence of a customer relationship is whether the associated person held himself out as a representative of the FINRA member or the investor relied upon his understanding that such an affiliation existed. Cases often emphasize or at least note that the associated person held himself out as representing a FINRA member or that the investor believed that the associated person was acting in his representative capacity when deeming the investor a customer. *See, e.g.*, *Cal. Fina Grp., Inc. v. Herrin*, 379 F.3d 311, 313, 318 (5th Cir. 2004) (noting that investors knew the broker was a registered representative of the broker-dealer and that "they made their investments based on his representations that he worked for his firm" before holding that investors were "customers" of broker-dealer); *Vestax*, 116 F. Supp. 2d at 868, 871; *WMA Sec.*, 80 F. Supp. 2d at 789. In *Herbert J. Sims*, the court in finding no customer relationship noted in particular that, "[w]hile the record shows that [the associated person] was employed by Plaintiff, the record does not even establish that [he] was acting in his capacity as an employee of [Plaintiff] when he solicited" funds through the investment advisor. 548 F. Supp. 2d at 766. *But see John Hancock*, 254 F.3d at 51 (investors were "customer" of investment broker affiliated with broker-dealer, even though they had no knowledge of association between broker and broker-dealer).

In this action, the associated person did not hold himself out as a representative of

the FINRA member, and there is no evidence that Defendant believed there to be any affiliation between the associated person and the FINRA member. Borakowski communicated with Defendant using a personal email address, and he signed the promissory notes in his capacity as the sole member of Echo Canyon, LLC. At the time of the investment, Defendant had no information except that he "believed [Borakowski] to be professionally related to [] George Kardaras" and Kardaras' LLC. (Doc. 10-1 at 10.) There is no evidence that Defendant knew of any relationship between Borakowski and Plaintiff until after the alleged wrongdoing occurred. There is not even evidence that Defendant knew while funding Echo Canyon that Borakowski was a broker or that he was associated with any FINRA member. Moreover, Borakowski was not associated with Plaintiff when Defendant's involvement with Echo Canyon began; it was only later that he became a registered representative of the broker-dealer. That Borakowski was not acting in a representative capacity, and that Defendant did not believe otherwise, suggests that Defendant was not Borakowski's—or Plaintiff's—customer.

### c. Absence of a customer relationship with Borakowski

Here, Defendant became a creditor of a sole member of an LLC and broker who then became associated with a member of FINRA. Plaintiff's success on the merits ultimately hinges on whether, if an individual invests in an LLC owned by an associated person, the individual is that associated person's customer under FINRA rules. Borakowski did not provide investment or brokerage services to Defendant; Defendant purchased neither any good nor any service from Borakowski. Borakowski further did not represent that he was acting on behalf of Plaintiff or any other FINRA member, and there is no evidence that Defendant believed otherwise. While the definition of "customer" is broad, it is not broad enough to encompass Defendant in his relationship with Borakowski. To find otherwise would unreasonably make Plaintiff Berthel Fisher and other FINRA members the guarantors of all of their registered representatives' business dealings, however unrelated to investment or brokerage services such dealings may be. Accordingly, Plaintiff has shown it likely that it will succeed on its claim against

arbitrability under FINRA rules and has satisfied the first requirement for a preliminary injunction.

### B.     Likelihood of Irreparable Harm

Plaintiff asserts that it faces irreparable harm if forced to arbitrate a dispute that it did not agree to arbitrate. (Doc. 7 at 12-13.) Defendant does not argue that Plaintiff will not suffer irreparable harm if Plaintiff is likely to succeed on the merits of its case. (*See* Doc. 20 at 11.) Plaintiff's time and resources expended for arbitration cannot be recovered, *see Maryland Cas. Co. v. Realty Advisory Bd. on Labor Rels.*, 107 F.3d 979, (2d Cir. 1997), and "[m]any courts have held that forcing a party to arbitrate a dispute that it did not agree to arbitrate constitutes per se irreparable harm." *Morgan Keegan & Co., Inc. v. Drzayick*, No. 1:11-CV-00126-EJL, 2011 WL 5403031, at *4 (D. Idaho Nov. 8, 2011) (quoting *Chicago Sch. Reform Bd. of Trs. v. Diversified Pharm. Servs., Inc.*, 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999)); *see also Morgan Keegan & Co., Inc. v. Jindra*, No. C11-5704BHS, 2011 WL 5869586, at *4 (W.D. Wash Nov. 22, 2011) (citing *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)). Similarly, "forcing a party to arbitrate a matter that the party never agreed to arbitrate[] unalterably deprives the party of its right to select the forum in which it wishes to resolve disputes." *Drzayick*, 2011 WL 5403031, at *4 (citing *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir. 2008)). As such, Plaintiff will suffer irreparable harm if the arbitration to which it did not consent proceeds.

### C.     Public Interest and Balance of Equities

While there does exist a federal policy in favor of arbitration, *see UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 655 (2d Cir. 2011) (citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)), that policy holds no sway when a party has not agreed to arbitrate in the first place. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (deeming federal policy favoring arbitration "inapposite" when issue is whether particular party is bound by arbitration agreement); *see also McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994). Allowing an arbitration to proceed without an agreement to

1 arbitrate does not serve the public interest. *See Drzayick*, 2011 WL 5403031, at *5. Further, denial of the preliminary injunction would lead to an expenditure of resources to obtain an arbitration resolution that would ultimately have to be set aside. *Charles Schwab & Co., Inc. v. Reaves*, No. CV-09-2590-PHX-MHM, 2010 WL 447370, at *8 (D. Ariz. Feb. 4, 2010). The balance of equities thus favors the Plaintiff. Accordingly, Plaintiff has satisfied all four elements required to establish the need for a preliminary injunction.

**IT IS THEREFORE ORDERED** granting Plaintiff's Motion for Preliminary Injunction (Doc. 6). Defendant Frandino and those in active concert or participation with him, including his attorneys, are preliminarily enjoined from proceeding against Berthel Fisher & Company Financial Services, Inc. in the arbitration filed by Defendant before FINRA as *Frandino v. Kardaras, et al.*, Case No. 12-01084.

**IT IS FURTHER ORDERED** that this preliminary injunction will become effective upon the posting of a bond in the amount of $1,000 by Plaintiff pursuant to Federal Rule of Civil Procedure 65(c).

Dated this 14th day of May, 2013.

_____
Neil V. Wake
United States District Judge